**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**NOTUS LLC d/b/a ROFX, EASY COM LLC d/b/a ROFX, GLOBAL E-ADVANTAGES LLC a/k/a KICKMAGIC LLC d/b/a ROFX, GROVEE LLC d/b/a ROFX, SHOPOSTAR LLC d/b/a ROFX, JASE DAVIS, BORYS KONOVALENKO, ANNA SHYMKO, ALLA SKALA, AND TIMOTHY STUBBS**<br><br>**Defendants.** | **Case No.  1:22-cv-20291**<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT** |

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), alleges as follows:

## I.      SUMMARY

1.      From at least January 2018 through September 2021 (hereinafter, the "Relevant Period"), Defendants Jase Davis ("Davis"), Borys Konovalenko ("Konovalenko"), Anna Shymko ("Shymko"), Alla Skala ("Skala"), and Timothy Stubbs ("Stubbs") (hereinafter, "Facilitating Defendants"), individually and as the controlling persons of the interrelated companies Notus LLC d/b/a ROFX ("Notus"), Easy Com LLC d/b/a ROFX  ("Easy Com"), Global E-Advantages LLC a/k/a Kickmagic LLC d/b/a ROFX ("GEA"), Grovee LLC d/b/a ROFX ("Grovee"), and Shopostar LLC d/b/a ROFX ("Shopostar") (hereinafter, "Corporate Defendants"), acting through, and/or in conjunction with, the web-based entity *www.ROFX.net*

("ROFX website"), acting as a common enterprise, misappropriated at least $58 million as part of a fraudulent scheme in, and/or in connection with, the offering of leveraged, margined or financed agreements, contracts, or transactions in retail foreign currency ("forex") to U.S. and international customers ("ROFX customers") who were not eligible contracts participants ("ECPs"). Facilitating Defendants, individually and as the controlling persons of Corporate Defendants—operating through a maze of interrelated companies, shared managers and members—accepted funds from ROFX customers that were intended to be used to margin, leverage or finance agreements, contracts, or transactions in forex as described on the ROFX website. Corporate Defendants and Facilitating Defendants (hereinafter, "Fraudulent Enterprise" or "Defendants") acted as a single, integrated common enterprise and misappropriated all of the $58 million they accepted from ROFX customers by immediately wiring said funds to offshore entities with no connection to forex trading.

2.  The Fraudulent Enterprise utilized the ROFX website as a vehicle to solicit and obtain customers. On the website, ROFX claimed to create and trade retail forex accounts on behalf of customers utilizing a highly successful automated trading robot purportedly created in 2009. ROFX advertised itself as a legitimate forex brokerage with offices in Miami, London, and Hong Kong and guaranteed coverage of any trading losses sustained by customers.

3.  Customers typically submitted an online application form on the website to open a retail forex trading account with ROFX. Thereafter, ROFX emailed customers an "invoice" directing customers to deposit or wire their funds to one or more of the Corporate Defendants, at continually changing U.S.-based bank accounts carried in the name of one of the Corporate Defendants, opened and/or controlled by one or more of the Facilitating Defendants.

4.      Throughout the Relevant Period, Facilitating Defendants accepted ROFX customers' funds into domestic Corporate Defendants' bank accounts but did not send ROFX customers' funds to a CFTC-registered futures commission merchant ("FCM") or retail foreign currency dealer ("RFED") to trade on behalf of customers.  Rather, Facilitating Defendants immediately wired ROFX customer funds offshore to non-trading corporate entities in Poland, Thailand, and elsewhere, as well as to Facilitating Defendants themselves.

5.      Facilitating Defendants were all corporate managers and officers of Corporate Defendants and did business as ROFX utilizing the ROFX website to solicit customers on their behalf as part of the Fraudulent Enterprise.  They repeatedly accepted ROFX customer funds into Corporate Defendants' bank accounts they controlled demonstrating knowledge of and participation in the predicate solicitation while knowingly, or recklessly, failing to disclose material facts to ROFX customers, including but not limited to:  (1) Defendants misappropriated all ROFX customer funds they accepted into Corporate Defendants' bank accounts; (2) Defendants did not trade forex for customers after accepting ROFX customers' funds; (3) Defendants did not forward ROFX customers' funds to any entity that traded funds on behalf of ROFX customers; (4) ROFX customers had no forex trading accounts; (5) there was no ROFX forex trading robot; and, (6) there were no ROFX corporate offices as falsely advertised on the website.  Upon information and belief, there is no legally formed business entity known as "ROFX" anywhere in the U.S.

6.      Defendants were joined in a common purpose of defrauding and profiting from ROFX customers, had relationships with and among each other, depended upon the participation of each other to accomplish their common purpose, and were each employed by and/or associated with the Fraudulent Enterprise during the Relevant Period.  Defendants accepted and

misappropriated at least $58 million from over 1,100 ROFX customers during the Relevant Period.

7.      By engaging in this conduct and the conduct further described herein, Defendants have engaged, are engaging and/or are about to engage in acts and practices in violation of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(2)(A), (C) and 9(1), and Commission Regulations, 17 C.F.R. §§ 5.2(b)(1), (3) and 180.1(a) (2021).

8.      Furthermore, Corporate Defendants, doing business as ROFX through the ROFX website, each acted as FCMs without being registered with the CFTC in violation of 7 U.S.C. § 6d(a)(1) because they were engaged in soliciting or accepting orders for retail forex transactions and accepted funds in or in connection therewith.

9.      Accordingly, pursuant to 7 U.S.C. §§ 2(c)(2)(C) and 13a-1, the CFTC brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and Regulations, and to enjoin them from engaging in any commodity-interest related activity, as set forth below.  The CFTC also seeks civil monetary penalties for each violation of the Act and Regulations, and remedial ancillary relief, including, but not limited to, disgorgement, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

10.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint, and similar acts and practices, as more fully described below.

## II.      JURISDICTION AND VENUE

11.      This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts

have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, 7 U.S.C. § 13a-1 provides that United States district courts possess jurisdiction to hear actions brought by the CFTC for injunctive relief or to enforce compliance with the Act whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder, and 7 U.S.C. § 2(c)(2)(C) provides the CFTC with jurisdiction over the forex solicitations and transactions at issue in this action.

12.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Defendants transact or transacted business in this District, and/or certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur within this District.  As alleged in the complaint, Defendants fraudulently misappropriated ROFX customer funds, including funds of customers residing in the Southern District of Florida.

### III.     THE PARTIES

#### A.     Plaintiff

13.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

#### B.     Defendants

14.     Defendant **Notus LLC d/b/a ROFX** is a recently dissolved Colorado limited liability company whose former principal office address was 3801 East Florida Avenue, Suite

400, Denver, Colorado 80210.  Notus is an entity which accepted approximately $22.6 million of the $58 million in ROFX customer funds Defendants misappropriated during the Relevant Period.  Konovalenko, Shymko, Skala, and a third party ("Third Party R.V.") are, or were, owners or members of Notus.  Notus has never been registered with the CFTC in any capacity.

15. Defendant **Easy Com LLC d/b/a ROFX** is a New Hampshire limited liability company whose principal office address is 155 Fleet Street, Portsmouth, New Hampshire, 03801. Easy Com is an entity which accepted over $15 million in ROFX customer funds during the Relevant Period.  Shymko and Davis are, or were, owners and members of Easy Com.  Easy Com has never been registered with the CFTC in any capacity.

16. Defendant **Global E-Advantages LLC a/k/a Kickmagic LLC d/b/a ROFX** is a Delaware limited liability company and New York foreign limited liability company with a service of process address at 55 14th Avenue, North Tonawanda, New York, 14120.  GEA is an entity which accepted over $4.8 million in ROFX customer funds during the Relevant Period. GEA has never been registered with the CFTC in any capacity.

17. Defendant **Grovee LLC d/b/a ROFX** is a Delaware limited liability company whose registered agent's address is 3422 Old Capitol Trail, Suite 700, Wilmington, Delaware 19808.  Grovee is an entity which accepted over $1.2 million in ROFX customer funds during the Relevant Period.  Grovee has never been registered with the CFTC in any capacity.

18. Defendant **Shopostar LLC d/b/a ROFX** is a Colorado limited liability company whose principal office address is 7887 East Belleview Avenue, Suite 1100, Denver, Colorado 80011 and principal office mailing address is 6619 Brock Circle, Brandon, Mississippi 39042. Shopostar is an entity which accepted over $13.5 million in ROFX customer funds during the

Relevant Period.  Konovalenko is, or was, an owner and manager of Shopostar.  Shopostar has never been registered with the CFTC in any capacity.

19.     Defendant **Jase Davis** resides in Brandon, Mississippi, and upon information and belief, was born in Ukraine.  Davis purchased Easy Com from Anna Shymko in November 2020. He represents himself as the sole member of Easy Com and is the sole signatory on two Easy Com bank accounts at Bank of America and JP Morgan Chase, into which he accepted over $15 million in ROFX customer funds during the Relevant Period.  Davis has never been registered with the CFTC in any capacity.

20.     Defendant **Borys Konovalenko** is a Ukrainian citizen and, upon information and belief, currently resides in Ukraine.  Konovalenko is, or was, an owner and managing director of Notus and is, or was, an owner and manager of Shopostar.  Konovalenko was a signatory or co-signatory to U.S. bank accounts into which he accepted over $23 million in ROFX customer funds during the Relevant Period, including: (a) a Notus account at Bank of America which accepted $9.3 million in customer funds; (b) two Shopostar accounts at Bank of America which accepted $13.5 million in customer funds; and (c) two Kickmagic accounts at Bank of America which accepted $556,000 in customer funds.  Konovalenko personally accepted funds from these accounts during the Relevant Period.  He has never been registered with the CFTC in any capacity.

21.     Defendant **Anna Shymko** resides in Duluth, Georgia.  Shymko was the managing member of Notus beginning April 14, 2021, until September 16, 2021, when she filed articles dissolving Notus with the Colorado Secretary of State.  In addition, Shymko organized and was the initial managing member of Easy Com beginning September 22, 2020, until November 3,

2020, when she purportedly sold all of her interests in Easy Com to Jase Davis.  Shymko has never been registered with the CFTC in any capacity.

22.    Defendant **Alla Skala** is a Canadian citizen who was born in Ukraine.  Upon information and belief, Skala resides in Grand Island, New York and/or Fort Erie, Ontario.  Skala identified herself as the sole owner of Notus and appointed herself as the manager of Notus on or about November 12, 2019.  On December 6, 2019, Skala filed Notus's foreign limited liability application with the New York Secretary of State.  Skala is a signatory and co-signatory to U.S. bank accounts into which she accepted over $26 million in ROFX customer funds during the Relevant Period, including:  (a) a Notus account at Key Bank which accepted $13.2 million in customer funds; (b) a Notus account at Bank of America which accepted $9.3 million in customer funds; and (c) a GEA account at M&T Bank which accepted $4.2 in customer funds.  Skala personally accepted funds from these accounts during the Relevant Period.  She has never been registered with the CFTC in any capacity.

23.    Defendant **Timothy Stubbs** is a U.S. citizen who, upon information and belief, is a Certified Public Accountant residing in Brandon, Mississippi and/or the Atlanta, Georgia area.  Upon information and belief, Stubbs resides or resided at one or both of the Brandon, Mississippi addresses provided on various Notus and Shopostar corporate filings with the Colorado Secretary of State.  Stubbs represents himself as the manager of Grovee and is the signatory on a Grovee account at Bank of America into which he accepted $153,000 in customer funds during the Relevant Period.  Stubbs personally accepted funds from this account and other Corporate Defendants' bank accounts accepting ROFX customer funds.  He has never been registered with the CFTC in any capacity.

C.    **Related Entity**

24.    **ROFX** is a fictitious, web-based entity that operated via the website

*www.ROFX.net*, which was hosted in the U.S.  Upon information and belief, ROFX is neither

registered to conduct business in the U.S. nor is it a legally organized collective entity.  Although

the website contained representations that ROFX purportedly operated from offices in Miami,

London, and Hong Kong, ROFX had no offices, no employees, and upon information and belief,

was created solely to further Defendants' fraudulent common enterprise.  ROFX has never been

registered with the CFTC in any capacity.

## IV.    STATUTORY BACKGROUND

25.    7 U.S.C. § 2(c)(2)(C)(i)(I), in relevant part, applies to any agreement, contract, or

transaction in, or in connection with, forex that is offered to, or entered into with, a person that is

not an ECP "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a

person acting in concert with the offeror or counterparty on a similar basis," subject to certain

exceptions not applicable here.

26.    7 U.S.C. § 1a(18)(A)(xi) defines an ECP, in relevant part, as an individual:  (a)

who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million,

or (b) $5 million if the individual enters into the transaction to "manage the risk associated with

an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the

individual."  Individuals who do not meet these criteria are non-ECPs.

27.    For the purposes of trading forex, an FCM is defined in 7 U.S.C. § 1a(28)(A), in

relevant part, as "an individual, association, partnership, corporation or trust . . . engaged in

soliciting or in accepting orders for . . . any agreement, contract, or transaction described in

section 2(c)(2)(C)(i)  [of the Act, i.e., "forex transactions"]" or "acting as a counterparty in any

agreement, contract, or transaction described in section 2(c)(2)(C)(i) [of the Act]"; and, in or in connection with these activities "accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."

28.     7 U.S.C. § 6d(a)(1) makes it unlawful for any person to act as an FCM unless such person is registered as such with the CFTC.

## V.     FACTS

### A.     Defendants' Fraudulent Scheme

29.     During the Relevant Period, the ROFX website claimed to offer and/or enter into retail forex agreements, contracts, or transactions on behalf of non-ECP customers by opening trading accounts on their behalf and purportedly utilizing an automated trading "robot" to profitably trade customers' accounts.  ROFX touted that it was the "best automated forex trading robot in the world," and the only trading system that "guarantee[d] coverage of losses."  In addition to the ROFX website, some customers were introduced to ROFX via social media and referrals by friends and family who had invested with ROFX.

30.     Facilitating Defendants, individually and as the controlling persons of Corporate Defendants, did business as ROFX via the ROFX website and used the website to conceal their participation in the scheme and acceptance of customer deposits and wires, many of which were clearly identified as associated with ROFX and forex trading.  No mention was made of any of the Defendants on the website.  The ROFX website fraudulently represented that ROFX operated a legitimate and successful forex robot trading or "Bot" platform with purported offices in Miami, London, and Hong Kong.  The ROFX website made false and misleading claims, which included, but were not limited to the following:

- "ROFX is the best automated trading robot in the world."

- "[T]he ROFX.net service is an exceptional service that guarantees your profits."

- "The inbuilt algorithms and neural [sic] networks are in hand to place the perfect trade when opportunity presents itself.  You do not have to make any intervention."

- "When you use ROFX.net, the developers assure that you will make no losses."

- "This platform is perhaps the only one that covers your losses."

- "The stop-loss system blocks trading at the minimum loss ('no loss forex robot')."

31.    ROFX made guarantees regarding the safety of investing and claimed to have specific "safeguards" in place to protect customers, including a "reserve fund," which allegedly covered negative trading results, and a "stop-loss system," which minimized trading losses on "bad days."  The ROFX website claimed, in pertinent part:

> Your money is safe, because:
> We guarantee the safety of your funds
> Negative results of trading are covered by our reserve fund.

32.    The ROFX website further represented that customers could earn greater "trading profits" based on which of the five offered "programs" the customer chooses, and the "program" with the highest minimum deposit "program" purportedly earned the highest "profit."  The ROFX website offered customers the following five programs:

- "Trial" required initial deposits of $1,000 to $5,000 payable in USD/EUR/BTC and payment of a performance fee of 60%.  In exchange, the customer was promised a 40% share in the daily trading profit;

- "Easy Start" required initial deposits of $5,000 to $10,000 payable in USD/EUR/BTC and payment of a performance fee of 50%.  In exchange, the customer was promised a 50% share in the daily trading profit;

- "Moneymaker" required initial deposits of $10,000 to $50,000 payable in USD/EUR/BTC and payment of a performance fee of 35%.  In exchange, the customer was promised a 65% share in the daily trading profit;

- "Gold" required initial deposits of $50,000 to $100,000 payable in USD/EUR/BTC and payment of a performance fee of 25%.  In exchange, the customer was promised a 75% share in the daily trading profit; and

- "VIP" program required initial deposits of $100,000 to unlimited payable in USD/EUR/BTC and payment of a performance fee of 15%.  In exchange, the customer was promised an 85% share in the daily trading profit.

33.     According to ROFX's representations on its website, ROFX did not need to be regulated:  "Being a software company, owners of AI technology and a managing company ROFX does not need to be regulated.  ROFX cooperates with top European, American and Asian brokerage platforms, licensed and regulated by the corresponding authorities."  However, there is no evidence that ROFX:  has ever been incorporated anywhere in the United States or elsewhere; has ever been registered in the United States or elsewhere; or, has any relationship with any forex brokerage.

34.     The ROFX website targeted retail customers with little to no forex trading experience:  "The ROFX robot is for anyone who wants to make money and to get a stable passive income on FOREX but has neither trading experience in the international currency and financial markets, nor time."  The ROFX website claimed that "[t]here is no need in any special knowledge, ability to analyse foreign exchange market, or many years of trading experience."

35.     Customers opened an ROFX trading account by providing their name and driver's license through the ROFX website.  The online account opening application did not seek any information about prospective customers' net worth and did not inquire as to whether a prospective customer is an ECP or had assets in excess of $5 million.  ROFX permitted customers to fund an account with U.S. dollars (USD), Euros (EUR), or Bitcoin (BTC).  Most of the ROFX customers are located in the U.S., including customers in this district.

36.     After customers established an ROFX account, they typically received a purported "payment invoice" with a corresponding invoice number via email from *support@rofx.net* with instructions to deposit their funds in bank accounts in the name of "Notus LLC" or one of the other Corporate Defendants.  Pursuant to the ROFX payment invoice's instructions, customers made a counter deposit via a cashier's check payable to one of the Corporate Defendants if the bank, then being used by Defendants, had a local branch convenient to the customer.  If there was not a local bank branch, customers typically forwarded funds to one of the Corporate Defendants via wire transfer.  Each Corporate Defendant received funds directly from customers via wires or checks.  Notations for customers' wire transfers appeared on Corporate Defendants' monthly bank account statements and bank wire records as "ROFX account deposit," "ROFX investment service," "investment transfer to ROFX," and "investment trading account," among others.  In some instances, Corporate Defendants' monthly bank statements and bank wire records showed individual customer names with specific invoice numbers provided to customers by ROFX.  By acting in common enterprise and utilizing the ROFX website to solicit or accept orders for retail forex agreements, contracts, or transactions and accepting ROFX customer funds in connection with these activities, Corporate Defendants acted as FCMs during the Relevant Period.

37.     Once customer funds were accepted into the Fraudulent Enterprise's various corporate bank accounts, customers were able to log into their accounts on the ROFX website via the Internet and view their purported profits and account balances.  Customers' online account information regularly showed trading profits even though there was no trading and therefore no profits.

**B.      The Fraudulent Enterprise's Misappropriation of Customer Funds**

38.     The Fraudulent Enterprise accepted the deposit of ROFX customer funds into bank accounts in the names of Corporate Defendants.  The Fraudulent Enterprise did not use any of the customer funds to enter into any forex agreements, contracts, or transactions on behalf of customers as promised.  Instead, it, through the acts of the Facilitating Defendants, misappropriated the funds, including by converting the funds to Defendants' own personal use and transferring the funds to various offshore entities with bank accounts in Eastern Europe, Thailand, and elsewhere.

39.     The Fraudulent Enterprise, through the acts of the Facilitating Defendants, also misappropriated customer funds by providing some customers with small withdrawals of purported "profits" via wires from one or more of the Corporate Defendants' bank accounts and/or offshore entities.  Customers made repeated requests for withdrawals directly through the ROFX website and via email to "support@rofx.net."  As no trading took place, and no profits were generated, any payments to customers of purported "profits" were in reality funds from later customers to earlier customers in the nature of a Ponzi scheme.

40.     The majority of customers were unable to withdraw funds from their accounts despite the false representations on ROFX's website that customers could withdraw funds at any time with no withdrawal fees.

41.     Some customers who attempted to terminate their accounts or withdraw large amounts were advised by purported ROFX employees via email or telephone that there was an issue with the customer's account preventing any withdrawal of funds.  For example, one customer ("Customer A") was notified by an ROFX employee that the depository bank had provided him with an unauthorized "chargeback" of his initial deposit; however, Customer A did

not have an account at the depository bank into which any of his funds could be returned. Similarly, another customer ("Customer B") was informed by email that ROFX was terminating his account due to the results of an anti-money laundering inspection ("AML"); Customer B was unable to obtain any information regarding his alleged AML violations or the inspection. Neither Customer A nor Customer B was able to withdraw their funds as requested.

**C.**     **The Fraudulent Enterprise's Material Omissions of Facts**

42.     Facilitating Defendants, individually and on behalf of Corporate Defendants, knowingly and/or recklessly failed to disclose material facts to actual and prospective customers while repeatedly accepting ROFX customer funds designated for trading, including failing to disclose that:

a.     There is no legal entity known as "ROFX," and ROFX does not utilize a forex "robot" or trade forex;

b.     The Fraudulent Enterprise never opened any trading accounts in customers' names and conducted no trading on their behalf via robot or otherwise;

c.     The Fraudulent Enterprise failed to advise customers who made deposits into the Corporate Defendants' bank accounts that their funds were not forwarded to a CFTC-registered FCM or RFED for forex trading on behalf of customers;

d.     The Fraudulent Enterprise misappropriated customer funds by accepting funds intended for trading into various bank accounts and then subsequently wiring those funds to offshore entities having nothing to do with forex trading; and

e.     Purported "returns" paid to some customers were in fact the principal deposits of other customers and were not generated by profitable trading.

**D.**     **Defendants Operated as a Common Enterprise**

43.     Corporate Defendants were interrelated shell companies serving no legitimate business purpose other than to defraud ROFX customers.  They operated together as ROFX through the ROFX website, shared the same officers and purported business addresses, accepted

ROFX customer funds into their various bank accounts, and transferred ROFX customer funds to common offshore entities.

44.     Facilitating Defendants controlled Corporate Defendants during the Relevant Period, were all corporate officers of Corporate Defendants, and used Corporate Defendants' bank accounts to collect, transfer, and disburse ROFX customer funds.  Together, Facilitating Defendants and Corporate Defendants used the ROFX website as a vehicle to solicit customers and convey the false messaging of ROFX's purported successful forex trading robot.  As described below, Facilitating Defendants created one or more of the Corporate Defendants in the United States and/or submitted corporate documents on behalf of Corporate Defendants utilizing common officers, addresses, and registered agents.  Facilitating Defendants also opened U.S. bank accounts on behalf of one or more of the Corporate Defendants, controlled Corporate Defendants' bank accounts including the deposits to and withdrawals from these accounts, and transferred ROFX customer funds between and amongst themselves and to the same offshore entities.

### 1.     Konovalenko, Shymko, and Skala Controlled and Operated Notus

45.     Konovalenko, Shymko, and Skala all controlled and operated Notus as part of the Fraudulent Enterprise until Shymko dissolved Notus in September 2021, as described below. These individuals submitted "Periodic Reports" with the Colorado Secretary of State on behalf of Notus, using at times an office mailing address of 6619 Brock Circle, Brandon, Mississippi, which is or was the address of a property owned by Timothy Stubbs.

46.     Notus was a Colorado limited liability company initially formed by a third party ("Third Party Y.Z.") on or about October 27, 2014, with a "principal office address" of 2821 S. Parker Road, Unit 407, Aurora, Colorado.  On October 28, 2015, Konovalenko filed a "Periodic

Report" with the Colorado Secretary of State, identifying Notus's "principal office street address" as 1942 Broadway Street, Suite 314C, Boulder, Colorado and "principal office mailing address" as 6619 Brock Circle, Brandon, Mississippi.  Konovalenko also filed a December 9, 2015 "Statement of Correction" and an additional September 29, 2016 "Periodic Report" on behalf of Notus using these same addresses.  On January 5, 2017, Stubbs filed a "Statement of Dissociation" on behalf of Notus using his address of 6619 Brock Circle, Brandon, Mississippi.

47.     In his Answer filed in *Birmingham v. ROFX.net*, Case No. 1:21-cv-23472 (S.D. Fla. Oct. 27, 2021), Konovalenko admitted to being the managing member of Notus until August 17, 2017, when he purportedly sold all of his interests in Notus to Third Party R.V.

48.     Third Party R.V. was the managing member of Notus beginning on August 17, 2017, and filed "Periodic Reports" on behalf of Notus with the Colorado Secretary of State from December 2017 through December 2019.

49.     According to a November 12, 2019 "Notus Resolution of the Sole Member of the Company," signed by Third Party R.V., Third Party R.V. resigned as the operational manager of Notus and sold all of his interests in Notus to Skala.  On November 29, 2019, Skala opened a bank account in the name of Notus at Key Bank in the United States with her son, Bartholomew Skala, and submitted the Notus resolution with her application indicating that she was the sole managing member of Notus.  Through the Notus Key Bank account, Skala accepted and misappropriated over $13.2 million in ROFX customer funds.

50.     On December 6, 2019, Skala filed a foreign limited liability application on behalf of Notus with the New York Secretary of State, Division of Corporations to conduct business using the fictitious name "NOTUS NY LLC" in the State of New York with a principal office at

102 Country Club Lane, Grand Island, New York.  Skala identified herself as the sole member of Notus on this application.

51.     On February 14, 2020, Konovalenko and Skala opened a bank account in the name of Notus at Bank of America in the United States.  Through the Notus Bank of America account, Konovalenko and Skala accepted and misappropriated over $9.3 million in ROFX customer funds.

52.     On April 14, 2021, Shymko purchased Notus from Skala.  On September 16, 2021, Shymko filed a "Statement of Dissolution" on behalf of Notus with the Colorado Secretary of State.  Shymko admitted these facts in her Answer filed in *Birmingham v. ROFX.net*, Case No. 1:21-cv-23472 (S.D. Fla. Oct. 27, 2021).

      **2.     Facilitating Defendants Controlled and Operated the Other Corporate Defendants**

53.     In addition to Notus, Facilitating Defendants controlled and operated other Corporate Defendants, including Easy Com, GEA, Grovee, and Shopostar.  Facilitating Defendants formed and/or opened bank accounts in the names of these other Corporate Defendants.  Through these Corporate Defendant bank accounts, the Fraudulent Enterprise accepted over $35 million in ROFX customer funds, along with over $22 million in ROFX customer funds deposited into the Notus accounts, and misappropriated all of these funds by transferring them to offshore entities having nothing to do with forex trading as discussed above.

**Easy Com (Davis and Shymko)**

54.     Shymko formed Easy Com as a New Hampshire limited liability company on September 22, 2020, and she was the sole member.  On November 3, 2020, Shymko sold Easy Com to Jase Davis pursuant to a signed agreement.  In her Answer filed in *Birmingham v.*

*ROFX.net*, Case No. 1:21-cv-23472 (S.D. Fla. Oct. 27, 2021), Shymko admitted to creating Easy Com and selling it to Jase Davis.

55.     In early-January 2021, Jase Davis opened U.S. bank accounts at Bank of America and JPMorgan Chase Bank in the name of Easy Com and was the sole signatory on these accounts.  Through these accounts, Davis accepted and misappropriated over $15.6 million in ROFX customer funds.

56.     Jase Davis filed Easy Com's Annual Report dated April 14, 2021, with the State of New Hampshire Department of State.

**Global E-Advantages a/k/a Kickmagic (Konovalenko, Skala)**

57.     GEA, also known as Kickmagic, is a Delaware limited liability company formed on January 15, 2015.  On the same day, Skala opened a U.S. bank account at M&T Bank in the name of GEA and was the sole signatory on this account.  Through this account, she accepted and misappropriated over $4.2 million in ROFX customer funds.

58.     In October 2019, Kickmagic changed its name to GEA with the Secretary of State of the State of Delaware.

59.     Konovalenko was the sole signatory on a Bank of America account in the name of Kickmagic and a co-signatory with his wife, Valeriia Konovalenko, on a second Bank of America account in the name of Kickmagic.  Through these accounts, Konovalenko accepted and misappropriated over $556,000 in ROFX customer funds.

**Grovee (Stubbs)**

60.     Grovee is a Delaware limited liability formed on October 15, 2020.  On November 18, 2020, Stubbs opened a bank account at Bank of America in the name of Grovee and was the sole signatory on this account.  Stubbs designated himself as the "Manager" of Grovee on the account opening documents.  On February 6, 2021, a third party ("Third Party

T.M.") opened a second account at Bank of America in the name of Grovee and was the sole signatory on this account.  Third Party T.M. designated herself as a "Member" of Grovee on the account opening documents.  Through these accounts, Stubbs accepted and misappropriated over $1.2 million in ROFX customer funds.

**Shopostar (Konovalenko)**

61.     Shopostar is a Colorado limited liability company initially formed by Third Party Y.Z. on or about July 14, 2014.  Konovalenko filed a "Periodic Report" on behalf of Shopostar with the Colorado Secretary of State in September 2015 and an Address Change report on behalf of Shopostar with the Colorado Secretary of State in March 2016.  For both filings, Konovalenko reported his address as 6619 Brock Circle, Brandon, Mississippi 39042, which is or was the address of a property owned by Stubbs.

62.     In his Answer filed in *Birmingham v. ROFX.net*, Case No. 1:21-cv-23472 (S.D. Fla. Oct. 27, 2021), Konovalenko admitted to being a member of Shopostar and claimed he sold his shares to a third party ("Third Party N.L.") on December 30, 2016, while remaining in the position of executive manager until April 15, 2019.

63.     Third Party N.L. filed "Periodic Reports" on behalf of Shopostar from September 2016 through September 2020, reporting on some of these filings that her address is 825 Southwind Lane, Brandon, Mississippi, which is or was the address of a property owned by Stubbs.

64.     Konovalenko was the sole signatory on a Bank of America account in the name of Shopostar and a co-signatory with Third Party N.L. on a second Bank of America account in the name of Shopostar.  Through these accounts, Konovalenko accepted and misappropriated over $13.5 million in ROFX customer funds.

**E.      Corporate Defendants Acted as Unregistered FCMs**

65.      At no time during the Relevant Period have Corporate Defendants been registered

with the CFTC as an FCM or in any other capacity.  At no time during the Relevant Period have

Corporate Defendants been exempt from the requirement to register as an FCM.

66.      During the Relevant Period, Corporate Defendants acted in a capacity that

required registration as FCMs because they:  (a) solicited or accepted orders for retail forex

transactions; and, (b) in or in connection with these activities accepted money, securities, or

property (or extended credit in lieu thereof) to margin, guarantee, or secure any trades or contracts

that resulted or may have resulted therefrom.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

### COUNT I
### FRAUD IN CONNECTION WITH FOREX
### Violations of 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1), (3)
### (All Defendants)

67.      The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

68.      7 U.S.C. § 6b(a)(2)(A) and (C) make it unlawful:

for any person, in or in connection with any order to make, or the making of, any
contract of sale of any commodity for future delivery, . . .  that is made, or to be
made, for or on behalf of, or with, any other person other than on or subject to the
rules of a designated contract market – (A) to cheat or defraud or attempt to cheat
or defraud the other person; [or] (C) willfully to deceive or attempt to deceive the
other person by any means whatsoever in regard to any order or contract or the
disposition or execution of any order or contract, or in regard to any act of agency
performed, with respect to any order or contract for or, in the case of paragraph (2),
with the other person.

69.      Pursuant to 7 U.S.C. § 2(c)(2)(C)(iv), 7 U.S.C. § 6b applies to the forex

agreements, contracts, or transactions offered by Defendants "as if" they were contracts of sale

of a commodity for future delivery.  Further, 7 U.S.C. § 2(c)(2)(C)(ii)(I) makes forex

agreements, contracts, or transactions "subject to" 7 U.S.C. § 6b.  Finally, 7 U.S.C. § 2(c)(2)(C)(vii) makes clear the CFTC has jurisdiction over an account that is offered for the purpose of trading forex.

70.    17 C.F.R. § 5.2(b)(1) and (3) (2021) make it unlawful for any person, by use of the mails or by any instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:  (1) to cheat or defraud or attempt to cheat or defraud any person; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

71.    Defendants violated 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1), (3), by willfully deceiving or attempting to deceive other persons in, or in connection with, the offering of leveraged, margined or financed retail forex transactions with non-ECPs, by, among other things:  (i) failing to disclose material facts to actual and prospective customers, including that no forex trading was conducted on behalf of customers; and (ii) misappropriating customer funds.

72.    Defendants engaged in the acts and practices described above willfully, intentionally, or recklessly.

73.    Defendants engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to:  interstate wires for transfer of funds, email, websites, and other electronic communication devices.

74.    Facilitating Defendants controlled Corporate Defendants, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Corporate Defendants to commit the acts and/or omissions alleged herein.  Pursuant to 7 U.S.C. § 13c(b), Facilitating Defendants are liable as controlling persons for Corporate Defendants' violations of 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1), (3).

75.     Facilitating Defendants acted within the course and scope of their employment, agency, or office with Corporate Defendants.  Pursuant to 7 U.S.C. § 2(a)(1)(B), Corporate Defendants are liable as principals for Facilitating Defendants' violations of 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1), (3).

76.     Each act of failing to disclose material facts and misappropriating, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1), (3).

## COUNT II
### FRAUD BY DECEPTIVE DEVICE OR CONTRIVANCE
### Violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)
### (All Defendants)

77.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

78.     7 U.S.C. § 2(c)(2)(C)(ii)(I) makes forex agreements, contracts, or transactions "subject to" 7 U.S.C. § 9(1).  Further, 7 U.S.C. § 2(c)(2)(C)(vii) makes clear the CFTC has jurisdiction over an account that is offered for the purpose of trading forex.

79.     7 U.S.C. § 9(1) makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of" the Regulations.

80.     17 C.F.R. § 180.1(a) (2021), which the CFTC issued in 2011 pursuant to 7 U.S.C. § 9(1), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for

future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1)      Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
(2)      Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
(3)      Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

81.      Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) by, among other things, in connection with contracts of sale of commodities in interstate commerce:  (i) omitting to state material facts necessary in order to make statements made not untrue or misleading, including omitting that no forex trading was conducted on behalf of customers; and (ii) misappropriating customer funds.

82.      Defendants engaged in the acts and practices described above willfully, intentionally, or recklessly.

83.      Defendants engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to:  interstate wires for transfer of funds, email, websites, and other electronic communication devices.

84.      Facilitating Defendants controlled Corporate Defendants, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Corporate Defendants to commit the acts and/or omissions alleged herein.  Pursuant to 7 U.S.C. § 13c(b), Facilitating Defendants are liable as controlling persons for Corporate Defendants' violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

85.      Facilitating Defendants acted within the course and scope of their employment, agency, or office with Corporate Defendants.  Pursuant to 7 U.S.C. § 2(a)(1)(B), Corporate

Defendants are liable as principals for Facilitating Defendants' violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

86.     Each act of omitting material facts and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

## COUNT III

### FAILURE TO REGISTER AS A FUTURES COMMISSION MERCHANT
### Violations of 7 U.S.C. § 6d(a)(1)
### (Corporate Defendants)

87.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

88.     7 U.S.C. § 6d(a)(1) provides that it shall be unlawful for any person to be an FCM unless such person is registered with the CFTC as an FCM.

89.     An FCM is defined in 7 U.S.C. § 1a(28)(A), in relevant part, as "an individual, association, partnership, corporation or trust . . . engaged in soliciting or in accepting orders for . . . any agreement, contract, or transaction described in section 2(c)(2)(C)(i) [of the Act]," and in or in connection with these activities "accepts any money, securities, or property . . . to margin, guarantee, or secure any trades or contracts that result or may result therefrom."

90.     During the Relevant Period, each Corporate Defendant operated as an FCM, by (a) soliciting or accepting orders for retail forex transactions as described by 7 U.S.C. § 2(c)(2)(C)(i); and, (b) in or in connection with these activities, accepting any money, securities, or property to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

91.     During the Relevant Period, Corporate Defendants violated 7 U.S.C. § 6d(a)(1) by failing to register with the CFTC as FCMs.

92.     Each instance during which Corporate Defendants acted as unregistered FCMs, including but not limited to those specifically alleged herein, and each day such unregistered conduct took place, is alleged as a separate and distinct violation of 7 U.S.C. § 6d(a)(1).

93.     Facilitating Defendants controlled Corporate Defendants, directly or indirectly, and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Corporate Defendants' violations of 7 U.S.C. § 6d(a)(1).  Therefore, pursuant to 7 U.S.C. § 13c(b), Facilitating Defendants are liable as controlling persons for Corporate Defendants' violations of 7 U.S.C. § 6d(a)(1).

## VI.     RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to its own inherent equitable powers, enter:

A.     An order finding that Defendants violated 7 U.S.C. §§ 6b(a)(2)(A), (C), 6d(a)(1), 9(1) and 17 C.F.R. §§ 5.2(b)(1), (3) and 180.1(a) (2021);

B.     An order finding that Corporate Defendants violated 7 U.S.C. § 6d(a)(1);

C.     An order of permanent injunction prohibiting Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(2)(A), (C), 9(1) and 17 C.F.R. §§ 5.2(b)(1), (3), 180.1(a) (2021);

D.     An order of permanent injunction prohibiting Corporate Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active

concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. § 6d(a)(1);

E.     An order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

(i)     Trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § la(40);

(ii)    Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3 (2021)) for their own accounts or for any account in which they have a direct or indirect interest;

(iii)   Having any commodity interests traded on Defendants' behalf;

(iv)   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(v)    Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(vi)   Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring registration or exemption from registration with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9) (2021); and/or

(vii)  Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person registered, exempted from

registration, or required to be registered with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9) (2021).

F.        An order directing Defendants to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* 17 C.F.R. § 143.8 (2021), for each violation of the Act and Regulations, as described herein;

G.        An order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

H.        An order requiring Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

I.        An order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices which constituted violations of the Act and Regulations, as described herein;

J.        An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

K.        An order providing such other and further relief as the Court may deem necessary and appropriate under the circumstances.

Dated:  January 27, 2022

Respectfully submitted,

By: /s/ Danielle Karst
Danielle Karst
Special Bar ID #A5501601
Timothy J. Mulreany
Special Bar ID #A5500950
**COMMODITY FUTURES TRADING
COMMISSION**
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone:  (202) 418-5000